IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEITH K.,[1]

    PLAINTIFF,

    v.

MARTIN J. O'MALLEY, Commissioner of
Social Security,[2]

    DEFENDANT.

Case No. 23 CV 1622

Hon. Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith K. seeks review of the final decision of the Commissioner of Social Security ("the Commissioner") denying him disability benefits under Title II of the Social Security Act. For the reasons set forth below, plaintiff's motion for summary judgment [8] is denied,[3] and the Commissioner's motion for summary judgment [11] is granted. The Commissioner's decision denying benefits is therefore affirmed.

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to plaintiff only by his first name and the first initial of his last name.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. He is automatically substituted as the named defendant pursuant to Fed. R. Civ. P. 25(d).

[3] The Court construes Plaintiff's Memorandum in Support of Reversing or Remanding Commissioner's Decision [8] as a motion for summary judgment.

BACKGROUND

## A. Plaintiff's Background

Plaintiff is 60 years old and lives in Illinois. R.151.[4] In 1997, he began working as a research engineer for a manufacturing company called Spraying Systems, but he eventually left the role in 2012 because he was struggling to finish his projects. R.124; R.127; R.620. Although plaintiff attempted to start a photography business from 2012 to 2014 and at one point worked as an Uber driver for a few months, he otherwise did not begin working again until February 2022. R.16; R.62; R.590.

Plaintiff has a history of both physical and mental impairments, though only his mental impairments are relevant to this appeal. R.19–20. Specifically, plaintiff alleges that his unemployment from 2015 to 2022 stemmed from his struggles with depression and anxiety. R.72–73. During this period, he describes experiencing a lack of motivation, an inability to concentrate, and thoughts of suicide. R.71–72. Other than doing dishes and laundry, he reports that most of his days during the relevant period were spent staring at the TV. R.65; R.72.

## B. Procedural History

On August 27, 2015, plaintiff applied for a period of disability and disability insurance benefits with an alleged onset date of December 1, 2014, which he later amended to July 23, 2015. R.16; R.518–19. The Social Security Administration ("SSA") denied this first request on January 13, 2016, R.234, and denied it again upon reconsideration on June 9, 2016, R.239. On June 6, 2018, following an April 2018

---

[4] Citations to the administrative record are contained in entries [6-1] through [6-5] of the district court docket.

hearing, an administrative law judge ("ALJ") determined that plaintiff did not meet the definition of "disabled" under the Act. R.175; R.261. On December 11, 2019, the Appeals Council vacated the decision and remanded the case to a new ALJ based on a challenge plaintiff brought under the Appointments Clause, U.S. CONST., Art. II, § 2, cl. 2. R.197.[5]

After an April 2020 hearing was postponed due to the COVID-19 pandemic, another hearing took place in April 2021. R.359; R.409. On August 9, 2021, the ALJ released a decision again finding that plaintiff was not disabled. R.200. On February 14, 2022, the Appeals Council issued an order vacating the August 2021 decision and again remanding the case back to the ALJ. R.224; R.437. The Appeals Council pointed out two deficiencies in the ALJ's prior decision warranting remand. First, it noted that the portion of the hearing recording that should have captured plaintiff's testimony was blank. R.225. Second (and relevant to this appeal), it found that the ALJ did not adequately evaluate the evidence from plaintiff's social worker, Megan Pfeifer. *Id.* Pfeifer had opined that plaintiff's inability to concentrate resulted in his failure to complete tasks and lack of motivation and productivity. The Appeals Council acknowledged that Pfeifer "initiated a discussion of this evidence," but it observed that the discussion was "cut off" and thus "not fully considered or waived." *Id.*

---

[5] According to the Appeals Council, the defect was cured because "on July 16, 2018, the Acting Commissioner of Social Security ratified all Administrative Law Judge appointments and approved them as her own under the Constitution." R.197.

3

Yet another hearing took place in June 2022. R.482. On August 2, 2022, the ALJ found that plaintiff still had not met the requirements to be considered "disabled" under the Act. R.13. The Appeals Council denied review of plaintiff's application on January 10, 2023, making the ALJ's decision the final agency decision. R.1; 20 C.F.R. §§ 404.955, 404.981. Plaintiff then appealed the final decision to this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [1].

## C. The ALJ's Decision

In her August 2, 2022, decision, the ALJ first noted plaintiff's request for a closed period of disability from July 23, 2015, to February 14, 2022. R.16. Despite plaintiff's request for a a closed period through February 14, 2022, the ALJ observed that he must have established disability as of December 31, 2019, which is the date plaintiff was last insured for purposes of the Act. *Id.*

The ALJ reviewed plaintiff's claims in accordance with the SSA's five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR § 404.1520. At step one, the ALJ found that plaintiff did not engage in substantial gainful activity from July 23, 2015, through December 31, 2019. R.19. At step two, the judge determined that plaintiff was suffering from depression, anxiety, and alcohol use disorder, which all qualify as "severe impairments" under 20 CFR 404.1520(c). *Id.* At step three, the ALJ ruled that plaintiff's impairments (considered alone or in combination) did not meet or equal the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. R.20. Before moving on to step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform

4

a full range of work at all exertional levels but with certain nonexertional limitations—namely that he could perform work "involving simple routine tasks requiring no more than short simple instructions and simple work related decision making with few work place changes; he could maintain occasional contact with the general public of a brief, superficial and incidental nature and occasional interaction with supervisors and co-workers." R.24.

At step four, the ALJ concluded that plaintiff did not have the RFC to perform his past relevant work as a photographer or research engineer. R.35. Finally, at step five, the ALJ determined that jobs existed in significant numbers in the national economy that plaintiff could have performed, including an office cleaner (200,000 jobs), assembler of small products (22,000 jobs), packager (40,000 jobs), and a mail clerk (12,000 jobs). R.35–36. As a result, the ALJ held that plaintiff was not disabled during the period in question.

## LEGAL STANDARD

A claimant is disabled under the Social Security Act if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether a claimant meets this definition, an ALJ applies a sequential five-step test, asking "(1) whether the claimant is currently employed; (2) whether she has a severe impairment or a combination of impairments that is severe; (3) whether her impairments meet or equal any impairments listed as

conclusively disabling; (4) whether she can perform her past work; and (5) whether she is capable of performing any work in the national economy." *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520(a)–(g)). The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five.

The Court will affirm an ALJ's decision denying disability benefits so long as it is supported by substantial evidence. *See Martinez v. Kijakazi*, 71 F.4th 1076, 1079 (7th Cir. 2023); *see also* 42 U.S.C. § 405(g). This means that the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052–53 (7th Cir. 2024) (quoting *Gedatus*, 994 F.3d at 900). Although substantial evidence requires "more than a mere scintilla, … the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (cleaned up). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Warnell*, 97 F.4th at 1052 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). An ALJ "need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and [her] conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (cleaned up).

## DISCUSSION

As a preliminary matter, plaintiff first challenges the Commissioner's formulation of the substantial evidence standard. Plaintiff then proceeds to make

three substantive arguments. First, he argues that substantial evidence did not support the ALJ's analysis of his subjective symptoms. Second, he contends that the ALJ did not properly account in his RFC for his limitations in concentration, persistence, or maintaining pace. Third, he maintains that the ALJ did not adequately assess the opinion of plaintiff's treating social worker, Pfeifer. The Court considers each of these arguments in turn.

## A. Disagreement on Standard of Review

Plaintiff takes issue with the Commissioner's contention that "plaintiff bears the burden of proving that no reasonable mind could draw the conclusions the ALJ drew." [12] at 1. He insists that the "mere possibility that somebody might accept an ALJ's conclusions in a disability matter does not satisfy the substantial evidence standard." [14] at 3. But substantial evidence only exists if "a *reasonable* mind" would accept the evidence as sufficient to support the ALJ's conclusions. *Biestek*, 587 U.S. at 103 (quoting *Consolidated Edison*, 305 U.S. at 229) (emphasis added). That a "reasonable" mind must accept the evidence as sufficient serves as an additional check on the ALJ's conclusions. Of course, plaintiff is correct to the extent he contends that an ALJ "must build logical bridges between the facts and her findings in order to satisfy the substantial evidence standard." [14] at 2; *see Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (ALJ must provide a "logical bridge from the evidence to his conclusion"). The Court applies this standard in the analysis that follows.

## B. Plaintiff's Subjective Symptoms

Plaintiff's first substantive argument is that the ALJ did not properly consider plaintiff's subjective reports of his symptoms. A plaintiff's own statements about his condition are one category of evidence an ALJ is to consider when making a disability determination. *See* 20 C.F.R. § 404.1513(a)(4). However, an individual's own statement "shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). In addition to their subjective symptoms, "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment." *Id.*

In reviewing the weight given to a plaintiff's subjective symptoms, the Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In other words, a court will uphold an ALJ's subjective symptom analysis "unless it is patently wrong." *Sharon B. v. Saul*, No. 19-2267, 2020 WL 8254259, at *2 (C.D. Ill. Dec. 14, 2020) (citing *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012)); *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong.'" *Elder*, 529 F.3d at 413 (cleaned up).

To start, the ALJ spent several paragraphs recapping how plaintiff described his symptoms throughout the evidentiary record. R.25. For example, the ALJ recounted statements plaintiff made in a "function report" in November 2015. *See id.* (citing R.610–18). In that report, plaintiff claimed that his "depression/anxiety limit

8

many normal/routine daily tasks," that his sleep patterns make him not want to get out of bed, and that he only showers when he knows he must leave the house. R.610. Plaintiff also reported that he left his job because he was not finishing projects or meeting deadlines. R.617. The ALJ also recounted the subjective statements plaintiff made during the June 2022 hearing. R.25. There, plaintiff reported that he lacked motivation and concentration, R.71–73, that he would go days without taking care of his personal hygiene, *id.*, and that dealing with people was too stressful, R.62; R.65. He also indicated that he had thoughts of suicide, which have since been alleviated with ketamine treatment. R.63.

Despite this evidence, the ALJ concluded that although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms were not entirely consistent with the medical evidence and other evidence in the record." R.25. This conclusion was not so lacking in reason that it was "patently wrong." *Elder*, 529 F.3d at 413. The ALJ spent at least nine pages of her order recounting the record evidence and explaining why she believed plaintiff's symptoms were not as debilitating as he claimed, citing findings from psychological examinations, therapy records, medication management records, mental status exams, state agency opinions, and a medical expert. *See generally* R.25–34. Although the Court will not rehash the ALJ's analysis as to each piece of evidence, the below examples make clear that her reasoning at least meets the applicable burden for this Court's review.

First, the ALJ pointed to the results of two psychological consultative evaluations performed in December 2015 and June 2016. R.26–27. As to the December 2015 evaluation, the examiner there reported some delay in memory testing but concluded that "the plaintiff's cognitive abilities were … found to be within normal limits." R.746. The June 2016 evaluation also reported positive findings. *See generally* R.758–61. For example, that examiner reported that plaintiff was "alert, calm and oriented regarding location, time, identity and circumstances and was cooperative with the entire evaluation process. His affect was wide ranging and grossly appropriate to the content of the interview, and his speech was clear, logical, and sequential with no unusual content or preoccupations evident." R.760. The second examiner also reported that plaintiff's "concentration and attention appear to be within normal limits, in that he remained well focused and on task throughout the evaluation without re-direction or reminding" and that his "general fund of knowledge appears to be grossly intact." *Id.* Finally, this examiner concluded that plaintiff's "capacity for abstraction [was] reasonably well developed" and that his "judgment appears to be grossly appropriate." *Id.*

Plaintiff contends that the ALJ inaccurately portrayed the results of the December 2015 evaluation and ignored its "far more dire findings." [8] at 9. But the "more dire findings" he points to come from the examiner's summary of plaintiff's own description of his symptoms. *See, e.g.*, R.746 ("*When asked to describe his symptoms, he reported having a lack of motivation with a difficult time falling asleep and getting out of bed once he is asleep.*") (emphasis added). Because the ALJ was attempting to

10

corroborate the severity of plaintiff's reported symptoms, she was entitled to focus on the objective findings over plaintiff's subjective reports. *Id.*

After discussing the results of the two psychological evaluations, the ALJ continued with a detailed analysis of plaintiff's health records over the relevant period, largely made up of medical management records and mental status exams. R.26–31. For example, the ALJ noted that, from April 2016 to April 2017, plaintiff's health records indicated that he received ongoing refills of his psychotropic medication, but there were no other changes to his course of treatment to indicate, for example, that his condition had been previously undermanaged. R.26; R.822–32. During a follow-up appointment in August 2017, plaintiff's psychiatrist noted plaintiff was "beleaguered over the last four months with tardiness in terms of refills." R.818. At the same time, however, plaintiff reported that "[w]hen I get my meds, I do real good. When I don't I get really irritable." *Id.* The psychiatrist's evaluation further notes that "[d]espite all, he is doing reasonably well;" "[h]e denies all despondency;" "he denies suicidality;" "no TIP to harm himself or others;"[6] "no mania;" "minimal anxiety;" "mildly irritable;" and "no psychosis in any form." *Id.* Referring to his attempt to begin a photography business, treatment notes around the same time indicate that plaintiff "returned to working this week and had one of his 'best days' on the job." R.1004.

The ALJ went on to analyze plaintiff's records through the remainder of the closed period. R.27–31. Although plaintiff's mental status exams at various points

---

[6] Although the record does not reflect what the acronym "TIP" means, the Court understands it to refer to "threat in present" or "threat in progress."

noted symptoms of depression and anxiety, the ALJ observed that they also exhibited positive findings—for example, that plaintiff otherwise remained cognitively and socially intact. *See, e.g.*, R.28–29; R.1125–26; R.1240–41; R.1276–1277. At various other points, the ALJ also noted that worsened symptoms tended to correlate with plaintiff's failure to take his medication as prescribed. R.26; R.29; R.776; R.790; R.1240.

The Court is also persuaded that the ALJ's decision denying disability benefits is supported by substantial evidence given the ALJ's reliance on the opinion of medical expert Dr. Michael Lace to determine plaintiff's impairments at step three of the analysis. R.33. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *see also Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) ("A finding of medical equivalence requires an expert's opinion on the issue."). Here, Dr. Lace independently reviewed the record (including what he described as the "somewhat variable" mental health exams) and concluded that plaintiff had not met any of the medical listings at step three of the five-step sequential analysis. R.33; R.55.

Despite all this evidence, plaintiff maintains that the ALJ's analysis was a "cherry-picking" endeavor "reflecting her obvious propensity to disbelieve Plaintiff's claims." [8] at 8. Although it is true that an ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding," she "need not mention every piece of evidence, so long as [she] builds a

logical bridge from the evidence to [her] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (cleaned up).

The Court's own review suggests that plaintiff's cherry-picking allegations on the whole lack merit. The ALJ did not "ignor[e] evidence that points to a disability finding." *Id*. To the contrary, she discussed the various contradictory evidence in the record and explained why she assigned plaintiff's self-described symptoms less weight. *See Warnell*, 97 F.4th at 1053 (affirming dismissal where the ALJ "acknowledged and grappled with conflicting evidence"). As referenced above, the ALJ noted various reports of worsened symptoms in plaintiff's mental health exams but weighed those reports with other normal findings during the same exams, which suggested his symptoms were not as severe as he claimed. *See, e.g.*, R.28–29; R.1125–26; R.1240–41; R.1276–1277. More specifically, she described that mental status exams in September 2018 "continued to show the claimant with deficits of mood and affect, as well as impaired attention and concentration." R.28 (citing R.1149–50). In the same report, though, she observed that "his intelligence was noted to be average, he remained cooperative, with average eye contact, clear speech, and normal posture. Thought process, thought content, and perception also remained within normal limits, as well as insight and judgment." R.28–29 (citing R.1149–50). As the Court has already stated, its role is not to reweigh this evidence or substitute its own judgment for that of the ALJ's. *See Gedatus*, 994 F.3d at 900.

Although they do not alter the outcome here, the Court does note two aspects of the ALJ's opinion that gave it some pause. First, at approximately three points in

its 22-page opinion, the ALJ opines that plaintiff's "various reported activities"—for example, a drone-flying hobby and assorted repair and organizational work around the home—were "wholly inconsistent" with more debilitating symptoms. *See* R.21–23; R.32. But the Seventh Circuit has indicated that a plaintiff's daily-living activities are not a reliable measure of his ability to work a full-time job because "a person has more flexibility in scheduling the former than the latter, can get help from other persons …, and is not held to a minimum standard of performance, as [he] would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Second, the Court highlights an unsupported inference the ALJ drew from plaintiff's December 2015 psychological consultative examination. The ALJ concluded that the findings from that examination were "wholly contrary to allegations that the claimant experienced panic attacks, as well as poor concentration and distractibility, impairing his ability to come to work on time and complete major projects." R.26. But this assertion overstates the examination's actual findings, which concluded only that plaintiff's cognitive abilities were "within normal limits" while still noting plaintiff's self-reported anxiety attacks and difficulties concentrating. R.744–46. Contrary to the ALJ's assumption, the report in no way indicates that plaintiff's reports of panic attacks were not credible. Moreover, the ALJ does not explain how the examination's findings cannot also be consistent with plaintiff's reported lack of concentration.

But setting aside these aspects of the ALJ's reasoning, the Court still finds the other evidence in the record sufficient to build a "logical bridge" between the evidence

and the ALJ's conclusion. As referenced above, the Court is especially persuaded by the ALJ's specific reliance on Dr. Lace's expert medical opinion as well as her analysis of plaintiff's various medical records. Although the ALJ's opinion may not be flawless, it nonetheless meets the standard applicable to this Court's review. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (affirming ALJ's credibility determination because even though it "was not flawless, it was far from 'patently wrong'").

### C. Limitation in Concentration, Persistence, or Maintaining Pace

Plaintiff next argues that the ALJ's mental RFC assessment did not adequately accommodate his moderate limitation in concentrating, persisting, or maintaining pace ("CPP"). CPP refers to "the abilities to focus attention on work activities and to stay on-task at a sustained rate." 20 CFR Pt. 404, Subpart P, App. 1, § 12.00G(3)(b)(iii). Meanwhile, a plaintiff's RFC "is an assessment of [their] ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). Put simply, a plaintiff's RFC measures the most they can do despite their limitations in the work setting. 20 C.F.R. § 404.1545(a); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Here, the ALJ's hypothetical to the vocational expert ("VE") regarding plaintiff's RFC set out the following nonexertional limitations:

> [H]e could perform work involving simple routine tasks requiring no more than short simple instructions and simple work related decision making with few work place changes; he could maintain occasional

> contact with the general public of a brief, superficial and incidental
> nature and occasional interaction with supervisors and co-workers.

R.24; R.77. Plaintiff contends that this hypothetical did not properly account for the moderate limitation in CPP that the ALJ identified at step three of her five-step analysis.

Until recently, the Seventh Circuit has "repeatedly rejected the notion that a hypothetical … confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014); *see also Winsted v. Berryhill*, 915 F.3d 466, 471 (7th Cir. 2019); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir. 2008). That is because "the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); SSR 85–15, 1985 WL 56857 (1985).

In 2017, the Commissioner amended the social security regulations to define a "moderate limitation" in functioning for the first time. *See Jason B. v. Kijakazi*, No. 22 C 1850, 2023 WL 1992188, at *6 (N.D. Ill. Feb. 14, 2023). According to that definition, a "moderate limitation" is one in which a plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00F(2)(c); *see also* Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01 (effective Jan. 17, 2017).

The Seventh Circuit first referenced the significance of this amendment in *Pavlicek v. Saul*, 994 F.3d 777 (7th Cir. 2021). There, the ALJ relied on the opinions of two non-examining agency consultants who filled out assessment forms containing both checklists and opportunities to provide narrative explanations. *Id.* at 783. The agency consultants rated plaintiff as "moderately" limited in areas related to CPP in the form's checklist portion and, in the form's narrative portion, explained that plaintiff could "perform at a consistent pace particularly if is [sic] engaged in a simple, repetitive tasks [sic]." *Id.* The Circuit held that the ALJ reasonably relied on the agency consultants' narrative assessments because the plaintiff's ability to perform simple, repetitive tasks was consistent with the "moderate" checklist ratings. *Id.* Relying on the new 2017 definition, the Circuit reasoned:

> A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, "fair" in ordinary usage does not mean "bad" or "inadequate." *So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.*

*Id.* (emphasis added).

District courts have differed on how broadly to read *Pavlicek*. Drawing on the language above, some courts read *Pavlicek* to suggest that an ALJ adequately accommodates a claimant's moderate CPP limitation when the ALJ restricts a claimant to simple, routine, repetitive tasks. *See, e.g., Dieker v. Kijakazi*, No. 20-CV-3223, 2022 WL 834951, at *15 (C.D. Ill. Mar. 21, 2022); *Jason B.*, 2023 WL 1992188, at *6; *Amalia C. v. Kijakazi*, No. 1:21-CV-01212, 2023 WL 2711609, at *8 (N.D. Ill. Mar. 30, 2023); *Amy T. v. Kijakazi*, No. 22 C 4391, 2023 WL 7386081, at *4 (N.D. Ill.

Nov. 8, 2023). Other courts have confined *Pavlicek*'s holding to its facts. In doing so, those courts reason that *Pavlicek* "merely reiterates" how the Seventh Circuit has approached the issue all along—that is, "in certain circumstances, a moderate limitation in CPP may be accommodated by limiting a plaintiff to simple, repetitive task[s], but there must be evidence to logically support that determination." *Sandra R.W. v. Comm'r of Soc. Sec.*, No. 3:20-CV-01368-MAB, 2022 WL 970583, at *10 (S.D. Ill. Mar. 31, 2022); *see also LaValley v. Kijakazi*, No. 20-CV-1432-SCD, 2021 WL 5200238, at *6 (E.D. Wis. Nov. 8, 2021).

The Court need not take a side in this debate because, in either case, the evidence logically supports the ALJ's RFC determination. Although an RFC assessment must incorporate all a claimant's limitations, "an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *see also Pavlicek*, 994 F.3d at 784 (ALJ permissibly relied RFC determination of two medical experts); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) ("[B]ecause Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to Goldsmith.").

In *Burmester*, for example, the Circuit held that an RFC limiting plaintiff to "simple, routine, repetitive tasks requiring only simple work-related decisions with few changes in the routine work setting and no more than occasional interaction with supervisors, coworkers, and the general public" adequately accounted for a moderate

CPP limitation. 920 F.3d at 509, 511. In crafting the RFC, the ALJ relied on a treating doctor's opinion that plaintiff could "understand, remember and carry out simple instructions subject to physical limitations," that "maintaining concentration and attention should be manageable," and that she "should be able to withstand routine work stress and adapt to typical job site changes." *Id.* at 511. The Circuit concluded that the "ALJ appropriately relied on the narrative statement in crafting the hypothetical to the vocation expert and the RFC." *Id.*; *see also Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018) (ALJ reasonably relied on psychologist's narrative that plaintiff had concentration and pace "necessary to fulfill a normal workday").

Here, like in *Burmester*, the ALJ reasonably relied on Dr. Lace's assessment of plaintiff's RFC when crafting her hypothetical. R.33. During the June 2022 hearing, Dr. Lace recommended only that plaintiff "be limited to occasional contact with coworkers, the general public, and supervisors, and … to work that did not involve any fast-paced production requirements." R.57. Notably, during the June 2022 hearing, Dr. Lace opined that plaintiff would be able to concentrate in a work setting for a sustained basis, even after considering the impairments noted during his mental status exams. R.58. In the same exchange, plaintiff's attorney questioned why Dr. Lace found plaintiff's CPP limitation only to be moderate, implying that the record showed he would not be able to sustain competitive work. *Id.* Dr. Lace replied:

> No, there wouldn't necessarily be a relationship there. There's no history of ongoing hospitalizations or extreme loss of concentration. There's ability [sic] to participate actively in treatment as stated in 16F, 1 to 2. So yes, attention issues as they appear in the mental status exams

certainly are there. Are they marked? There's nothing to suggest that they are.

*Id.* Dr. Lace also rejected the attorney's suggestion that plaintiff might need extra breaks in the work setting, concluding that he "shouldn't have any struggles in that regard" based on his limitations. R.60.[7]

In addition to Dr. Lace's medical opinion, the ALJ also noted the results of plaintiff's two psychological examinations, which both found his cognitive abilities to be within normal limits when doing certain tasks, like simple math problems and counting in sevens backwards. R.22 (citing R.746, R.760). In particular, the ALJ noted a finding from the June 2016 examination that plaintiff's "concentration and attention appear[ed] to be within normal limits, in that he remained well focused and on task throughout the evaluation without re-direction or reminding." *Id.* (citing R.760).

Finally, plaintiff's argument also fails because he has not pointed to any medical opinion recommending limitations beyond those included in the RFC. "[A]n ALJ does not commit an error when 'there is no doctor's opinion contained in the

---

[7] Plaintiff also relies on *DeCamp v. Berryhill*, where the Seventh Circuit held that an ALJ could not rely on several doctors' narrative explanations regarding plaintiff's CPP limitations without also addressing a moderate limitation noted in the checkbox section of one report. 916 F.3d 671, 675–76 (7th Cir. 2019). But plaintiff does not address how his argument under *DeCamp* is consistent with the Seventh Circuit's subsequent holding in *Pavlicek*, 994 F.3d at 783. And, even under *DeCamp,* plaintiff does not advance any argument that the ALJ improperly ignored the "moderate" limitations in CPP contained in the checkbox sections of the state agency reports. *See* R.157; R.170. Regardless, the narrative explanations provided within those assessments support the ALJ's RFC determination under *Pavlicek*. *See* R.158 (noting plaintiff "retains the mental capacity to understand and remember simple and detailed instructions," could "make work related decisions and could interact and communicate sufficiently in the work environment," and could "adapt to simple, routine changes and pressures"); R.171 (same).

record which indicated greater limitations than those found by the ALJ.'" *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)). Here, plaintiff only points to the findings of impaired concentration in his mental status exams, but the ALJ's analysis makes clear that she considered those findings and simply assigned them less weight. Moreover, it is "unclear what kinds of work restrictions might address [plaintiff's] limitations in concentration, persistence, or pace because he hypothesizes none." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019); *see also Pavlicek*, 994 F.3d at 784.

Before moving on, the Court notes one error in the ALJ's reasoning (although, again, it does not change the outcome). In her CPP analysis, the ALJ once again opined that plaintiff's "various reported activities" were "wholly inconsistent with more than moderate limitations in concentration, persistence, or pace." R.22. For example, plaintiff indicated he was starting up a photography business, R.1125, that he tried to sell some of his photography at an art show, R.62, and that he attempted to turn his drone-flying hobby into an aerial photography business, R.62. But as described above, the Seventh Circuit has rebuked the use of a claimant's activities of daily living to suggest he can sustain a full-time job. *See, e.g.*, *Bjornson*, 671 F.3d at 647. Although the types of activities in which plaintiff engaged and which the ALJ relied upon are different than the daily-living activities at issue in *Bjornson* (*e.g.*, walking up to one block, sitting or standing for up to 15 minutes, lifting 10 pounds, bathing and dressing normally, *id.*), their still-sporadic nature are unhelpful in establishing plaintiff's ability to concentrate for an eight-hour workday. *Contra*

21

*Amalia C.*, 2023 WL 2711609, at *9 (finding that ALJ appropriately accommodated CPP limitation in part based on claimant's reported activities).

Ultimately, although the ALJ's analysis was not perfect, the Court finds that the ALJ adequately considered plaintiff's CPP limitation in the formulation of his RFC. The ALJ reasonably relied on the only medical opinion assessing plaintiff's CPP capabilities in a work setting. Plaintiff also has not pointed to any other medical opinion recommending greater restrictions, nor has he hypothesized other restrictions that might address his limitations.

### D. Pfeifer's Opinion

Plaintiff next argues that the ALJ failed to properly assess the opinion of his social worker, Megan Pfeifer. Plaintiff began seeing Pfeifer in February 2020. R.2073. In March 2020, Pfeifer filled out a form questionnaire regarding plaintiff's impairments. *See generally* R.1323–24. In the report, Pfeifer indicated that plaintiff's illness markedly restricted his cognitive functioning, and especially his memory. R.1323. She also indicated that plaintiff's illness "markedly impact[ed] [his] ability to sustain concentration, resulting in frequent failure to complete tasks." R.1324. Finally, in the questionnaire, Pfeifer also noted that plaintiff was "reportedly unable to follow through with most tasks" and that "living outside of the current setting would possibly result in destructive and potentially life-threatening behaviors due to lack of accountability." *Id.*

One section of Pfeifer's report also considered whether certain activities caused or triggered plaintiff's symptoms. Pfeifer reported that encounters with other people

22

and with groups of people triggered significant increases in plaintiff's anxiety, as did coping with supervisors, coworkers, and the public while at work. R.1323. Pfeifer further noted that stress and productivity demands caused increased (but not debilitating) anxiety for plaintiff, while dealing with family caused him minor anxiety. *Id.*

Pfefier completed the same report again in March 2021. *See generally* R.1360–61. Her second report noted that plaintiff experienced panic attacks when leaving his home and also experienced "severe brain fog and a depletion of memory, both short and long term." R.1360. In response to a prompt regarding concentration and attention, Pfeifer reported that plaintiff showed "no interest in any activities, and his concentration and attention to tasks, whether preferred or non-preferred, is minimal if any." R.1361. When asked for other comments regarding plaintiff's ability to perform sustained work, Pfeifer remarked: "While I do believe that Keith wants to feel motivated and productive, it seems that he lacks the ability to do so. This lack of motivation and productivity seems to be directly correlated with the symptoms of his diagnosis." *Id.*

In April 2021, Pfeifer wrote a letter stating that plaintiff's "current therapy goals include[d] increasing his ability to recognize and cope with feelings of depression, restructuring negative patterns of thought related to self and others, and reducing overall social withdrawal." R.1525. Pfeifer also reported that plaintiff had "been making progress toward establishing a healthy set of coping skills to regulate both depression and anxiety symptoms." *Id.*

23

As a preliminary matter, plaintiff suggests that Pfeifer's opinion is entitled to special deference under the "treating source rule," also known as the "treating physician rule." The rule applies to applications for benefits filed before March 27, 2017. *See Cieszynski v. Kijakazi*, No. 22-2024, 2023 WL 2523499, at *3 (7th Cir. Mar. 15, 2023) (citing 20 C.F.R. § 404.1520c). According to the rule, "the opinion of a 'treating source'—typically a physician—is entitled to 'controlling weight' if it is adequately supported by objective medical evidence and is consistent with other substantial evidence in the record." *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010). However, only "acceptable medical sources" can be characterized as "treating sources." *Jessica K. v. Saul*, No. 19-CV-4380, 2020 WL 4015330, at *11 (N.D. Ill. July 16, 2020) (quoting *Phillips*, 413 F. App'x at *11). Because Pfeifer as a social worker is not a *medical* source, her opinion is not entitled to any special deference. *See* 20 C.F.R. § 404.1502(a), (e) (listing licensed physician and psychologist as "acceptable medical sources" and public and private social welfare agency personnel as "nonmedical sources"); *cf. Jessica K.*, 2020 WL 4015330, at *11 (finding treating therapist was not an acceptable medical source).

Although Pfeifer's opinion is not entitled to controlling weight, an ALJ nonetheless must consider it as part of the disability determination. *See Grosjean v. Colvin*, No. 1:13–CV–88, 2014 WL 4494415, at *11 (N.D. Ind. Sept. 12, 2014). The opinions of nonmedical professionals are evaluated on the same factors used to evaluate acceptable medical sources, including the length of treatment relationship, frequency of examination, the consistency of the opinion with other evidence, whether

the treater is a specialist, and the quality of support of the opinion. 20 C.F.R. § 404.1527(c); *see also Phillips*, 413 F. App'x at *7. Finally, "[a]lthough the opinions of other medical sources are important and should be considered when evaluating key issues such as impairment severity and functional effects, their findings cannot establish the existence of a medically determinable impairment." *Phillips*, 413 F. App'x at *7 (cleaned up).

Plaintiff generally contends that the ALJ failed to properly assess the evidence supplied by Pfeifer and "appeared to search for reasons to undermine" it. [8] at 15. But upon reviewing the ALJ's reasons for assigning Pfeifer's opinion less weight, the Court is convinced that the ALJ did not substantially err.

First, the ALJ found Pfeifer's March 2020 and March 2021 checklists had "limited probative value" because Pfeifer only began treating plaintiff on February 27, 2020, which was after the date last insured. R.34. Although retrospective diagnosis of an impairment can support a finding of past impairment, *see Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006), "there must be contemporaneous medical evidence of the applicant's condition." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *see also Marquardt v. Saul*, 798 F. App'x 34, 37 (7th Cir. 2020). And here, the ALJ concluded that although Pfeifer's March 2021 questionnaire "would likely be work preclusive," the opinion "was not supported by the overall record" and therefore did not support a disability finding. R.34. The ALJ also credited the opinion of Dr. Lace, who found that plaintiff's "noted inability to work was not supported by the objective medical evidence of record." *Id.*

25

The Court's assessment of the ALJ's reasoning regarding Pfeifer's opinion is consistent with other lines of Seventh Circuit precedent governing an ALJ's treatment of evidence gathered after the date of last insured. In some instances, the Seventh Circuit has vacated disability determinations where an ALJ refused to consider evidence past the date last insured altogether. *See, e.g.*, *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984); *Bjornson*, 671 F.3d at 649. In *Halvorsen*, for example, the ALJ refused to consider at all a report from after the claimant's insured period had ended. *Id.* at 1223. The Circuit vacated the ALJ's decision for failure to consider the evidence, reasoning there was "no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Id.* at 1225.

Meanwhile, the Seventh Circuit has been more lenient where an ALJ has at least considered the evidence but assigned it less weight based on the time it was collected. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) ("[I]t is evident from the ALJ's decision that she did not 'fail to consider' this evidence, but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period."); *accord Guranovich v. Astrue*, No. 09 C 3167, 2011 WL 686358, at *25 (N.D. Ill. Feb. 15, 2011), *aff'd*, 465 F. App'x 541 (7th Cir. 2012) (ALJ had good reason to assign post-insured opinion little weight because "the ALJ found more persuasive the fact that his relationship did not begin" until after the period last insured and the opinion was "inconsistent with the testimony" of other providers).

26

Unlike in *Halvorsen* and *Bjornson*, the ALJ here did not refuse to consider Pfeifer's evidence altogether. To the contrary, the ALJ considered Pfeifer's opinion but found it to have "limited probative value" and therefore to be "entitled to minimal weight" because Pfeifer's relationship with plaintiff began after the date last insured. R.34; *see Eichstadt*, 534 F.3d at 667. As discussed above, the ALJ offered several other reasons to reject Pfeifer's opinions in addition to timing. For example, as to the March 2021 questionnaire, the ALJ concluded that the evidence was not supported by the rest of the record. R.34. As to the April 2021 letter, the ALJ noted that its contents were "conclusory," that it also did "not include any work-related limitations," and that Dr. Lace discounted the value of the opinion because it did not reference the severity of plaintiff's condition. R.33–34. In his memorandum, plaintiff admits Pfeifer's April 2021 letter is devoid of work-related limitations but insists that, "taken in context," the letter "certainly bolsters the statements Ms. Pfeifer had previously submitted." [8] at 15. The Court is not convinced the letter has much bolstering effect, especially given the other limitations the ALJ noted with Pfeifer's submissions.

Plaintiff further contends that the ALJ should have assigned Pfeifer's opinion more weight "because the Appeals Council had specifically directed her to consider Ms. Pfeifer's opinions." [8] at 15. But the Court disagrees that the Appeals Council's mere direction to consider Pfeifer's opinions precludes a finding that the opinions have little probative value. This is especially so given that the Appeals Council's remand was not based on any earlier, substantive error on the ALJ's part in analyzing Pfeifer's opinions. Instead, the Appeals Council merely observed that after the ALJ

27

"initiated a discussion of [the] evidence," the discussion was "cut off" and "not fully considered or waived." R.225.

Finally, plaintiff appears to take issue with the ALJ's characterization of the questionnaires as "checklist forms," suggesting that this description portrays some sort of unfair bias against the value of the evidence. [8] at 15. The Court is not persuaded, where nothing else in the record before it supports plaintiff's conjecture that the ALJ discounted the value of the evidence due to its format. In any case, the ALJ's characterization of the questionnaires is not entirely false. Many of the questionnaire's substantive questions required Pfeifer to answer "yes" or "no" with an opportunity to provide examples if Pfeifer answered in the affirmative. *See generally* R.1360–61.

In sum, the ALJ did not substantially err in assigning little weight to Pfeifer's opinion after the date last insured.

## CONCLUSION

For the foregoing reasons, the Court affirms the Commissioner's August 2, 2022, decision denying plaintiff disability benefits. Plaintiff's motion for summary judgment [8] is therefore denied, and the Commissioner's motion for summary judgment [11] is granted. The case is now terminated.

Georgia N. Alexakis
United States District Judge

Date: 11/8/24